# United States Court of Appeals

## For the First Circuit

No. 05-2762

EZRA CHARITABLE TRUST, MIRROR MANAGEMENT, LTD., ROBERT BOVIT,

Plaintiffs, Appellants,

v.

TYCO INTERNATIONAL, LTD., EDWARD D. BREEN,
DAVID J. FITZPATRICK, PRICEWATERHOUSECOOPERS, LLP.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge]

Before

Selya, Lipez, and Howard, Circuit Judges.

Kenneth J. Vianale, with whom Vianale & Vianale LLP, Biron L. Bedard and Cook & Molan, P.A. were on brief, for appellants.
Francis P. Barron, with whom Stephen S. Madsen, Cravath, Swaine & Moore LLP, Edward A. Haffer and Sheehan, Phinney, Bass & Green, were on brief for appellees, Tyco International LTD., Edward D. Breen and David J. Fitzpatrick.
Michael P. Carroll, with whom Michael S. Flynn, Davis Polk & Wardwell, Arnold Rosenblatt, Cook, Little, Rosenblatt & Manson, P.L.L.C., Christian M. Hoffman, Lisa C. Wood and Foley Hoag LLP were on brief, for appellee PricewaterhouseCoopers LLP.

September 27, 2006

**HOWARD**, **Circuit Judge**. Plaintiffs Ezra Charitable Trust, Mirror Management, Ltd., and Robert Bovit brought this action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), against defendants Tyco International, Ltd., Edward R. Breen (Tyco's chief executive office), David J. Fitzpatrick (Tyco's chief financial officer), and PricewaterhouseCoopers, LLP (Tyco's auditor)("PwC"). The district court dismissed the action as to all defendants on the ground that the amended class action complaint did not adequately allege scienter under the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b), and plaintiffs appealed. We affirm.

**I.**

We present the facts as set forth in the amended class action complaint and the SEC filings relied upon in the complaint. See Gross v. Summa Four, Inc., 93 F.3d 987, 991 & 994 n. 6 (1st Cir. 1996).

The context of this action -- viz., the travails of Tyco -- is well-known. Plaintiffs recount at some length the reported abuses of Tyco's past officers and directors, notably chief executive officer Dennis Kozlowski, chief financial officer Mark Swartz, chief corporate counsel Mark Belnick, and director Frank Walsh. In 2002, as revelations of misconduct surfaced, there was a major shake up at Tyco. Tyco commissioned a massive internal

-2-

investigation led by the law firm of Boies Schiller & Flexner, which was aided by various accounting firms. All told, over 15,000 attorney hours and 50,000 accountant hours were invested.[1] As a consequence, Tyco disclosed the alleged misconduct of its prior management and made necessary accounting adjustments. The changes were costly, as Tyco's Form 10-K report for fiscal 2002 showed a net loss of over nine billion dollars, a stark contrast from its nearly four billion dollars of profit in fiscal year 2001, and over four and a half billion dollars profit in fiscal year 2000. As part of Tyco's clean-up, new senior officers and directors were appointed. Breen was made the chief executive officer in July 2002, and Fitzpatrick was made the chief financial officer in September 2002.

Plaintiffs' action focuses on the initial results of the clean-up, spanning the period between December 30, 2002 and March 12, 2003.[2] Plaintiffs allege that the clean-up fell well short of sanitizing Tyco's books, and that new management perpetuated a fraud in the accounting for ADT, one of Tyco's largest subsidiaries.

---

[1] The scope of the investigation was broad, and included the integrity of the company's financial statements, the possible existence of systemic fraud, and corporate governance issues. The investigation yielded numerous recommendations regarding Tyco's accounting and corporate governance practices.

[2] The misconduct during the prior period is the subject of other, ongoing class-action law suits.

Plaintiffs allege that ADT, a provider of security systems, purchased customer contracts from its authorized dealers and accounted for the transactions in the following improper manner. First, ADT would ostensibly agree to purchase a customer contract from a dealer for $1000. Second, the dealer would ostensibly agree to pay ADT $200 as reimbursement for ADT's expenses in connection with acquiring the contract (the "connection fee"). Third, ADT would remit the $800 net amount to the dealer (the only cash that changed hands), record the acquisition of the contract at the full price of $1000, and record a $200 expense offset (income). Significantly, ADT's actual expenses related to each contract were de minimis - $5 for a credit check - and ADT recorded the difference ($195) as income. Plaintiffs allege that this was "Alice in Wonderland" accounting because Generally Accepted Accounting Principles ("GAAP") require that intangible assets such as these contracts be recorded at their actual cost (here $805), and because no income is to be recognized under such circumstances. Thus, according to plaintiffs, these transactions permitted Tyco/ADT to fraudulently overstate ADT's income and assets.

Plaintiffs allege that the defendants made actionable misrepresentations in connection with these transactions. First, in its 12/30/02 Form 8-K filed with the SEC, Tyco's management disclosed the results of the internal investigation and stated that

-4-

Tyco was "not aware of any systemic or significant fraud related to the Company's financial statements or of any clear accounting errors that would materially adversely affect the Company's reported earnings or cash flow from operations for the year 2003 and thereafter."   The Form 8-K also purported to correct ADT's accounting, noting that to the extent the connection fee exceeded actual costs, it "should be deferred and amortized over the estimated useful life of an acquired customer relationship" (ten years).  As a consequence, the Form 8-K reported that 2002 earnings would be reduced by $135 million, and that a $185.9 million charge to earnings would be taken to adjust income improperly recognized in fiscal years 1999 to 2001 (a $320.9 million adjustment in all).  Tyco's Form 10-K, filed on 12/30/02, largely echoed the Form 8-K's representations.  Notably, it stated that "new senior management has no reason to believe that the financial statements included in this report are not fairly stated in all material respects."  As to ADT's contract acquisitions, the Form 10-K noted that fees received from dealers, in excess of actual costs incurred, would be amortized over ten years as a "deferred credit."  The 10-K also included PwC's audit opinion, dated December 23, 2002, which stated:

> In our opinion, the accompanying consolidated balance sheets and related consolidated statements of operations, of shareholders' equity and of cash flows present fairly, in all material respects, the financial position of Tyco International, Ltd.

and its subsidiaries at September 30, 2002 and 2001, and the results of their operations and their cash flows for each of the three years in the period ended September 30, 2002, in conformity with accounting principles generally accepted in the United States of America . . . . We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America . . . .

Plaintiffs assert that these releases contained four fraudulent misstatements by the Tyco defendants: (1) that Tyco's accounting had been corrected; (2) that the financial statements fairly presented Tyco's status; (3) that all material accounting issues, particularly those involving ADT, had been corrected; and (4) that ADT would receive a $320.9 million revenue stream over the next ten years. Plaintiffs maintain that these representations were false because there were still major problems in ADT's books, notably that the income recognized from dealer "connection fees" to ADT was "imaginary," and that the contracts acquired were being recorded at an artificially inflated cost. Plaintiffs assert that the defendants corrected only a technical, inconsequential error -- that the "imaginary" income was being recognized too quickly (immediately rather than over the life of the contract) -- in their initial restatement, but knowingly permitted more significant errors -- the improper recognition of income and the inflation of asset value -- to remain unaltered. Plaintiffs also allege that

-6-

PwC, knowing of the errors in ADT's books, nonetheless wrongfully issued a "clean" audit opinion.

Plaintiffs allege that the fraud was brought to light in March 2003, when Tyco essentially admitted the fraud in a press release and subsequent Form 10-Q. In a March 12, 2003 press release, Tyco stated that, pursuant to ongoing discussions with the SEC, it expected "to take non-cash, pre-tax charges between $265 million and $325 million for issues identified primarily in [ADT]." Tyco also announced that the president of ADT, Jerry Boggess, and other senior ADT managers, had been fired. Tyco stock dropped significantly on the news. Plaintiffs say that defendants acknowledged in their 3/31/03 Form 10-Q that they had been in ongoing discussions with the SEC about their accounting for the dealer fees and were changing their accounting for the non-refundable dealer charges to treat them properly as a reduction in ADT's costs in acquiring the contracts.[3]

Plaintiffs also allege that Tyco falsely attributed the March 2003 accounting corrections to a then-recently issued accounting requirement from the Financial Accounting Standards Board's Emerging Issues Task Force ("EITF") -- EITF 02-16 -- which had nothing to do with the relevant accounting issue. Plaintiffs

---

[3] Plaintiffs also note that the Form 10-Q announced over $900 million in additional charges to earnings to correct various accounting problems unearthed by "intensified . . . internal audits and detailed controls and operating reviews . . . ."

assert that the proper accounting principle is and was located in Accounting Research Bulletin ("ARB") 43, which has been in effect since 1953.

Plaintiffs also emphasize the actions of PwC's audit engagement partner for Tyco, Richard Scalzo. The SEC, in an Accounting and Auditing Enforcement Action dated August 13, 2003, barred Scalzo from practicing accounting before it based on its finding that Scalzo had violated Section 10(b) and Rule 10b-5 and committed improper professional conduct in connection with his audits of Tyco for fiscal years 1997-2001. See 2003 WL 21938985 (SEC Release No. 1839). Essentially, the SEC concluded that Scalzo was on notice of prior management's misconduct, failed to take the necessary steps required by Generally Accepted Auditing Standards ("GAAS"), and recklessly permitted PwC to issue audit reports stating that Tyco's books had been audited according to GAAS.

Plaintiffs assert that the Tyco defendants had two basic motivations for the alleged fraud. First, they wished to keep Tyco viable as a going concern. Plaintiffs allege that Tyco had over four billion dollars in debt coming due in early 2003, and faced imminent bankruptcy if it failed to meet these obligations. Their theory is that management misstated ADT's accounting to give the false impression that Tyco had a $320.9 million revenue stream,

which permitted Tyco to obtain crucial financing.[4]  Second, they wanted to preserve their own lucrative positions, which included large salaries, bonuses, and stock options.  Plaintiffs allege that the Tyco defendants highlighted their deceit by providing false explanations for the belated correction.

As to PwC, plaintiffs allege that PwC's audit opinion was fraudulent because PwC knowingly failed to comply with GAAS and was aware that Tyco's accounting was not in compliance with GAAP. Plaintiffs state that PwC's motive was straightforward.  PwC looked the other way on Tyco's new fraud, just as it allegedly had with past frauds, to preserve its lucrative business relationship with Tyco.

The district court dismissed the complaint, concluding that scienter was inadequately alleged.  As to Breen and Fitzpatrick, the court concluded that their financial stake in Tyco's continued viability was inadequate, standing alone, to create a strong inference of scienter, and that the balance of the allegations amounted to nothing more than "fraud by hindsight," as there was no basis for concluding that Breen and Fitzgerald knew the disputed representations were false when made.  The court also held that, because Tyco's liability was solely derivative of

---

[4]Plaintiffs note that the Tyco defendants did not fully correct ADT's accounting until after Tyco had successfully placed an over four billion dollar bond offering and obtained a one and a half billion dollar line of credit.

Breen's and Fitzpatrick's, the claims against the corporate entity should be dismissed. Finally, the court concluded that PwC's financial stake in its continued business relationship with Tyco was inadequate to create a strong inference of scienter, and that the remaining allegations were either too vague or pertained only to conduct outside the class period.

## II.

Plaintiffs argue that the district court erred in evaluating in isolation their allegations of scienter on the part of the Tyco defendants rather than assessing the collective picture. They further contend that the court erred in failing to appreciate the import of the alleged GAAP and GAAS violations that PwC countenanced, as well as the relevance of PwC's past misconduct in auditing Tyco.

We review the allowance of the defendants' motions to dismiss de novo. Aldridge v. A.T. Cross Corp., 284 F.3d 72, 78 (1st Cir. 2002). In reviewing a motion to dismiss, we take as true all well-pleaded allegations and draw all reasonable inferences in the plaintiff's favor; however, we are free to "disregard bald assertions, unsupportable conclusions, and opprobrious epithets." In re Credit Suisse First Boston Corp., 431 F.3d 36, 45 (1st Cir. 2005). Moreover, we "may affirm on any independently sufficient ground." Badillo-Santiago v. Naveira-Merly, 378 F.3d 1, 5 (1st Cir. 2004).

In general, a securities fraud claim has six elements: (1) a material misrepresentation or omission; (2) scienter; (3) connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. Dura Pharma., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005). Our focus here is on the adequacy of plaintiffs' allegations of scienter. Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud," and a plaintiff must allege that "defendants consciously intended to defraud, or that they acted with a high degree of recklessness." Aldridge, 284 F.3d at 82.

Under the PSLRA, the complaint must first provide detailed pleading about each of the statements challenged, including factual allegations illustrating precisely why the challenged statement is misleading. Greebel v. FTP Software, Inc., 194 F.3d 185, 193-94 (1st Cir. 1999).[5] The PSLRA also requires the complaint to plead particular facts that give rise to a strong (rather than merely reasonable) inference of scienter.[6] This

---

[5] The PSLRA provides:

> [T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).

[6] As to scienter, the PSLRA states:

-11-

alters the usual Rule 12(b)(6) standard, in that while the "court continues to give all reasonable inferences to plaintiffs, those inferences supporting scienter must be strong ones." In re Cabletron Sys., Inc., 311 F.3d 11, 28 (1st Cir. 2002).

"We have interpreted [the PSLRA scienter] provision as demanding a recitation of facts supporting a 'highly likely' inference that the defendant acted with the required state of mind." In re Stone & Webster, Inc., Sec. Litig., 414 F.3d 187, 195 (1st Cir. 2005). In making this assessment, we have eschewed any reliance on a rigid pleading formula, instead "preferring to rely on a 'fact-specific approach' that proceeds case by case." Cabletron, 311 F.3d at 38. "Scienter allegations do not pass the 'strong inference' test when, viewed in light of the complaint as a whole, there are legitimate explanations for the behavior that are equally convincing." Credit Suisse, 431 F.3d at 49; see also Aldridge, 284 F.3d at 82 ("The plaintiff must show that his characterization of the events and circumstances as showing scienter is highly likely."). Pleading "fraud by hindsight," essentially making general allegations "that defendants knew

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(2).

earlier what later turned out badly," is not sufficient. Gross, 93 F.3d at 991 (internal citation and quotation omitted).

## A. Tyco defendants

As to the Tyco defendants, the plaintiffs argue that several factors which, taken together, establish scienter: (1) the significant GAAP violation in ADT's accounting; (2) defendants' false exculpatory statement that the March restatement was mandated by EITF 02-16; (3) the close proximity between the March restatement and the purported December 2002 correction; (4) defendants' knowledge of Kozlowski's relationship with Boggess and ADT; and (5) defendants' desire to save Tyco and maintain their lucrative positions. We conclude that the district court correctly dismissed the claims.

We begin with context. The plaintiffs assert that the district court failed to view their allegations in their entirety. But we think it is the plaintiffs who are being myopic. Plaintiffs pay too little heed to the circumstances in which the alleged fraud was taking place: Tyco had new management, was in the midst of a massive clean-up of fraud, and had disclosed the wrongdoing of prior management. We think that it is important to bear this context in mind as we evaluate plaintiffs' claims.

Tyco's statements were not nearly so absolute as plaintiffs present them. For example, the statement in the Form 8-K that management was currently unaware of systemic fraud was made

-13-

in the context the Form 8-K's recounting of the investigation, prior management's transgressions, and the impossibility of correcting all errors:

> Few, if any, major companies have ever been subjected to the corporate governance and accounting scrutiny entailed in Phase 2 of the Boies Firm's work. However, despite the extent of the Boies Firm's work, the Company has not sought to go back and identify every accounting decision and every corporate act over a multi-year period that was wrong or questionable, or whether there was a preferable accounting treatment among the alternative treatments available under [GAAP]. Given the size and scope of the Company's operations, such a task, or anything approaching it, would have been impossible within any plausible time-frame. Moreover, in part because of the passage of time, documentation was not always available; the documentation that was available was often dispersed; and neither the Boies Firm nor the Company had the benefit of information from prior senior management of Tyco because the former Chief Executive Officer, Chief Financial Officer, and Chief Corporate Counsel have all been under criminal indictment during the course of this review and analysis. All of these factors, as well as the Company's past failure to document many decisions contemporaneously, would have limited the conclusions that could have been drawn concerning individual accounting treatments in any event. Nonetheless, for the actual purposes of the work, as discussed above, the Company believes that the scope and detail of the review, and the documentation and information available, was sufficient to reach the conclusions discussed below.

> The Company is not aware of any systemic or significant fraud related to the Company's financial statements or of any clear accounting errors that would materially adversely affect the Company's reported

-14-

earnings or cash flow from operations for the year 2003 and thereafter. However, as discussed below, certain instances of erroneous accounting entries have been identified and corrected. In addition, current management has concluded that, in the past, the Company in general suffered from poor documentation; inadequate policies and procedures to prevent the misconduct of senior executives that occurred; inadequate procedures for proper corporate authorizations; inadequate approval procedures and documentation; a lack of oversight by senior management at the corporate level; a pattern of using aggressive accounting that, even when not erroneous, was undertaken with the purpose and effect of increasing reported results above what they would have been if more conservative accounting were used; pressure on, and inducements to, segment and unit managers to increase current earnings, including by decisions as to what accounting treatment to employ; and a lack of stated and demonstrable commitment by former senior corporate management to set appropriate standards of ethics, integrity, accounting, and corporate governance. . . .

Similarly, the Form 10-K's representation that new management believed the financial statements were fairly stated included the caveat:

There can be no assurances, however, that new problems will not be found in the future. We expect to continue to improve our controls with each passing quarter. It will take some time, however, before we have in place the rigorous controls that our Board of Directors and new senior management desire and our shareholders deserve.

The Form 10-K sounded other cautionary notes as well. Under "risk factors," in addition to cautioning that continuing negative publicity and pending litigation could have a substantial

-15-

negative impact on Tyco, the Form 10-K warned that more bad news could be on the horizon:

> We and others have received various subpoenas and requests from the SEC, the District Attorney of New York, and the U.S. Attorney for the District of New Hampshire and others seeking the production of voluminous documents in connection with various investigations into our governance, management, operations, accounting and related controls. We cannot predict when these investigations will be completed, nor can we predict what the results of these investigations may be. It is possible that we will be required to pay material fines, consent to injunctions on future conduct, lose the ability to conduct business with government instrumentalities or suffer other penalties, each of which could have a material adverse effect on our business....

Perhaps most significantly, the Form 10-K also specifically cautioned about on-going review by the SEC:

> As of the filing date of this Form 10-K, we continue to be engaged in a dialogue with the SEC's Division of Corporation Finance, as part of a routine review of our periodic filings. While we believe that we have resolved the material accounting issues prior to filings there can be no assurance that the resolution of the remaining comments issued by the Staff will not necessitate one or more amendments to this or prior periodic reports.

Essentially, the warned-of hazard came to pass regarding ADT's contract accounting. See Financial Acquisition Partners LP v. Blackwell, 440 F.3d 278, 288-89 (5th Cir. 2006) ("what [the company] warned might happen, did indeed happen"). All told, these cautionary statements are far more concrete, in light of Tyco's

-16-

circumstances, than vague "boilerplate" warnings. Compare Plotkin v. IP Axess Inc., 407 F.3d 690, 697 (5th Cir. 2005). Moreover, attempts to provide investors with warnings of risks generally weaken the inference of scienter. See Geffon v. Micrion Corp., 249 F.3d 29, 37 (1st Cir. 2001). From this context, we proceed to plaintiffs' specific allegations.

As to GAAP violations, there is nothing in the complaint supporting an inference that Breen or Fitzgerald were directly involved in these detailed accounting matters or had knowledge of their alleged falsity. See Stone & Webster, 414 F.3d at 199 (nothing supporting inference that senior officers were involved in details of accounting). While Fitzgerald, as chief financial officer, might be expected to have some general supervisory role over the accounting issues, he appeared on the scene only weeks before the Form 8-K was prepared, and there is no indication that he was aware of any impropriety. See id. Moreover, the representations in Tyco's filings were, in essence, estimations of whether the books still contained significant errors. Plaintiffs' allegations fall short of establishing that these estimations were unreasonable in light of the massive internal investigation. See id. at 201. In sum, there are no alleged facts that strongly suggest that the defendants knew any of the challenged statements were false when made. See Credit Suisse, 431 F.3d at 49-50; see also Blackwell, 440 F.3d at 289 (no factual allegations supporting

inference that individual defendants knew true value of assets or that discount rate or credit-loss assumption was improper).

Plaintiffs' reliance on the defendants' allegedly false attribution of the restatement to EITF 02-16 is similarly flawed. Obviously, evidence of conscious wrongdoing may be shown by facts demonstrating concealment. See generally Cabletron, 311 F.3d at 39. But the allegations fall short again here. There is simply no basis for concluding that the individual defendants were involved in or had personal knowledge of this detailed accounting issue. See Stone & Webster, 414 F.3d at 199.

Plaintiffs are correct that a short time period between an alleged misstatement and a later disclosure of inconsistent information may be relevant to the question of scienter. See Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1225 (1st Cir. 1996). In this case, however, the timing of the correction has limited probative value, as the change appears to have been prompted by SEC's Division of Corporation Finance.[7]  The simple fact of a

---

[7]Plaintiffs have moved the court to take judicial notice of the SEC's 2006 complaint against Tyco in the United States District Court for the Southern District of New York, the subsequent consent decree, and the final judgment entered against Tyco (collectively the "Consent Decree"). In the Consent Decree, Tyco agreed to pay a 50 million dollar civil fine and not to contest, inter alia, that ADT's contract accounting was wrongful.  We grant the motion.
   We note that the SEC describes ADT's accounting practices somewhat differently than do the plaintiffs.  According to the SEC, in 1997, Tyco began charging dealers a $200 connection fee when ADT purchased their contracts while simultaneously increasing the price ADT paid to the dealers by $200 (from $800 to $1000).  Tyco then classified this premium "paid" to the dealers a "growth bonus."

correction is also not particularly probative; "[p]laintiffs may not simply seize upon disclosures made later and allege that they should have been made earlier."  Cabletron, 311 F.3d at 37.

That the defendants were generally aware of Kozlowski's relationship with Boggess also does not suffice.  It is ordinarily not sufficient to conclusorily allege "an overarching fraudulent scheme or corrupt environment."  Credit Suisse, 431 F.3d at 49.  Similarly, that there had been issues with ADT is not enough.  "Fraud cannot be inferred simply because [a parent corporation] might have been more curious or concerned about the activity at [a subsidiary]."  Chill v. Gen. Elec. Co., 101 F.3d 263, 270 (2d Cir. 1996).  Moreover, plaintiffs fail to account for both Breen's and Fitzgerald's general unfamiliarity with Tyco.[8]  Indeed, the fact of

The $200 connection fee was immediately recognized as income, but the offsetting $200 growth bonus was amortized over 10 years. Because the connection fee and growth bonus cancelled each other out, they did not alter the economic substance of the contract acquisition, should not have been recognized under GAAP, and significantly inflated Tyco's income and cash flow.  The SEC noted that Tyco terminated the connection fee and restated its operating income and cash flow in 2003 as a result of a review by the SEC's Division of Corporation Finance.

Plaintiffs assert that the SEC action validates their claims, as the SEC found the same conduct that plaintiffs challenge to be wrongful under the securities laws.  However, the Consent Decree, in addition to being three years after the fact, is of very limited relevance.  That the SEC concluded that an ADT accounting practice, adopted in 1997 by past Tyco officers, was wrongful, adds little to creating a strong inference of scienter on the part of current Tyco officers.

[8]Interestingly, Tyco noted the presence of new management unfamiliar with Tyco in the midst of a clean up as a "Risk Factor" in its Form 10-K:

Breen's and Fitzpatrick's recent arrivals, and consequent lack of involvement in past dubious decisions, undermines most of plaintiffs' allegations.

This brings us to plaintiffs' allegations of motive and opportunity. "'[C]atch-all allegations' which merely assert motive and opportunity, without something more, fail to satisfy the PSLRA." Cabletron, 311 F.3d at 39. The question becomes whether plaintiffs have alleged "more than the usual concern by executives to improve financial results." Id.

The key motivation alleged is Breen's and Fitzgerald's desperation to save Tyco from bankruptcy. Plaintiffs rely on three

---

In the past few months, we have replaced our senior management with entirely new members and our entire board of directors determined not to stand for reelection at our next annual general meeting of shareholders. It will take some time for our new management team and our new board of directors to learn our various businesses and to develop strong working relationships with our cadre of operating managers at our various subsidiary companies. Our new senior management team's ability to complete this process is hindered by their need to spend significant time and effort dealing with internal and external investigations, developing effective corporate governance procedures, strengthening reporting lines and reviewing internal controls. During this period and in order to complete the process, our new executives will be in part dependent on advisors, including certain former directors. We cannot assure you that this major restructuring of our board of directors and senior management team will not adversely affect our results of operations, at least in the near term, especially in light of the significant attention they are required to devote to such other matters.

factual allegations to support the inference that Tyco faced imminent bankruptcy: (1) that Tyco had to repay or refinance nearly four billion dollars in debt in February 2003; (2) that Breen acknowledged that Tyco faced a liquidity gap in 2003 if it failed to obtain a one and a half billion dollar line of credit; and (3) that some suppliers had requested letters of credit from Tyco. These allegations are rather limited and conclusory, particularly when set against Tyco's enormous assets (well over sixty billion dollars worth, per the Form 10-K), significant shareholder equity (over twenty-five billion dollars), and substantial going-concern value (despite significant continued write-downs, Tyco earned approximately a billion dollars in 2003 and its earnings have climbed steadily since then). This collection of facts does not support a strong inference of imminent bankruptcy. Cf. Baron v. Smith, 380 F.3d 49, 57 (1st Cir. 2004)(an event of default is different from an actual default).

Further, this case is different from those relied upon by the plaintiffs. Here, the defendants were not acting to conceal their own errors or justify their past strategic decisions. Compare Cabletron, 311 F.3d at 38-39; Aldridge, 284 F.3d at 83-84. In addition, the defendants' compensation appears to be largely "up-front" or otherwise guaranteed, perhaps as an acknowledgment of risk. As to their stock options, it is not at all clear why defendants would prefer postponing profit reducing and stock price

reducing write-downs to future years (when their options would have vested) to swallowing the entire bitter pill in 2002.

The dueling inferences, taken as wholes, break down as follows. Did the defendants, brought in to clean up a massive and well-publicized fraud and actively scrutinized by the SEC, financial media, and bar, fraudulently commit an accounting violation (and fully document their fraud in Tyco's SEC filings) to briefly delay recognition of an additional write-down in the ADT books and present the illusion of a limited[9] additional revenue stream to obtain needed financing, only to reveal their wrongdoing to all concerned (including their new creditors) in a subsequent filing to the SEC shortly thereafter? Or did the new management, having been advised by an internal investigation of errors in ADT's accounting that required a 320 million dollar adjustment, believe their job was done as to that subsidiary (one of approximately 2300), only to subsequently discover (with the SEC's assistance) that ADT's books had more mischief to address than first realized? Under all the facts and circumstances alleged, the second inference is at least as strong as the first and thus dooms plaintiffs' claims. See Credit Suisse, 431 F.3d at 49.

---

[9] A 320 million dollar income stream to be recognized over ten years (or 32 million dollars a year) would appear to be of limited consequence in obtaining over four billion dollars in loans and over an additional billion and a half dollars in credit, while simultaneously recognizing a nine billion dollar loss.

**B. PwC**

Plaintiffs emphasize the following allegations as demonstrating PwC's scienter: (1) that the initial restatement of the ADT books in 2002 was an "obvious" GAAP violation that resulted in a significant second restatement less than three months later; (2) that PwC committed a host of GAAS violations in connection with its 2002 audit; (3) that Scalzo was intimately involved in the creation of the 2002 financial statements; (4) that PwC was well aware of prior bad acts by Tyco's former management and ignored the numerous "red flags" implicated by those acts; and (5) that PwC had an enormous financial incentive to keep Tyco as a client. Plaintiffs stress that PwC specifically reaffirmed the validity of the 2001 financial statements in its 2002 audit opinion, rendering the prior misconduct relevant to the instant action. We again conclude that the district court reached the correct result.

We first note, as did the district court, that plaintiffs attempt to muddy the waters with their emphasis on 2001. The only representations made by PwC challenged by plaintiffs in this action are contained within PwC's 2002 audit opinion letter. While the 2002 audit opinion makes a passing reference to 2001, the fact remains that plaintiffs' action targets representations, made at the close of 2002, regarding ADT's contract acquisition accounting. Plaintiffs have shown no connection between their current action and any representations in the 2001 financial statements.

Moreover, the prior misconduct relating to prior years' financial statements had been disclosed in Tyco's 2002 filings. As before, plaintiffs have overlooked the most important circumstances of the case: that new management had been appointed and Tyco was attempting to clean up its operations.

For that reason, plaintiffs' reliance on Scalzo's conduct is unavailing. Indeed, the SEC's ruling banning Scalzo from practicing accountancy before it specifically refers to his wrongful conduct in the 1997 through 2001 fiscal years. While plaintiffs assert that Scalzo was still assigned to Tyco in 2002, the climate had changed. Given the internal investigation, new management, massive restatements, and public scrutiny, it is not a likely inference, based upon the factual allegations, that Scalzo (to whatever extent that he remained involved) was still engaged in the same wrongful conduct. And in any event, plaintiffs fail to provide any specific allegations regarding Scalzo's involvement in the 2002 financial statements. Furthermore, plaintiffs' allegations that PwC disregarded various "red flags," based upon its detailed knowledge of past misdeeds, is unavailing. Correcting the past misstatements was the focus of the new management and the internal investigation. Significantly, the SEC's ruling banning Scalzo does not mention the dealer accounting issue at ADT (or anything like it), making it questionable whether PwC would have been aware of difficulties there. The presence of "red flags" not

-24-

acted upon by an auditor is not sufficient to raise a strong inference of scienter if there are no facts showing that the auditor knew (or willfully blinded itself to the knowledge) that the underlying facts, if properly accounted for, would result in significant changes to audited financial statements. See Fidel v. Farley, 392 F.3d 220, 229 (6th Cir. 2005).

Having cleared the underbrush, we now examine the plaintiffs' remaining allegations against PwC. We start with the alleged GAAP violation. "Merely stating in conclusory fashion that a company's books are out of compliance with GAAP would not itself demonstrate liability under section 10(b) or Rule 10b-5." Cabletron, 311 F.3d at 34. Moreover, the circumstances are more complex than plaintiffs indicate -- that intangible assets like the contracts are recorded at actual cost pursuant to ARB 43. One complication, as plaintiffs concede, is that "ARB 43" has no relevance to this issue, as it was superceded long ago by Accounting Principles Board Opinion 17 and Financial Accounting Standards Board Opinion 147 (although plaintiffs maintain that the underlying principle has remained the same). Another is that the ADT contract acquisitions also included a connection fee (and a growth bonus in the SEC's description). These additional transactions make the accounting issue more complex, as ADT's records create the impression that ADT in fact received cash from a vendor, a circumstance that PwC notes is specifically dealt with

-25-

in EITF 02-16.  See generally Greebel, 194 F.3d at 205 (GAAP can tolerate a range of reasonable approaches).  Plaintiffs presume that it should have been obvious to PwC that the connection fee and growth bonus were bogus entries that essentially netted out of the contract price.[10]  However, there do not appear to be any facts supporting this presumption.[11]  Simply pleading that the defendant knew of the falsity, without providing any factual basis for that knowledge, does not suffice.  Stone & Webster, 414 F.3d at 205-06.

Further, that ADT's accounting was ultimately restated in March 2003 does not raise a significant inference of scienter. "[T]hat a speaker changes his or her mind and decides after the fact that an earlier opinion was ill-advised is insufficient to support an averment of subjective falsity."  Credit Suisse, 431 F.3d at 49.  Moreover, as noted above, Tyco was in ongoing discussions with the SEC regarding its accounting practices, so neither the change nor its timing adds to the scienter equation.

---

[10] Even if one deemed PwC's failure to discover the problem negligent, or perhaps inexcusably negligent, that is well short of the conscious misconduct or extreme recklessness necessary to allege scienter.  See Geffon v. Micrion Corp., 249 F.3d 29, 35-36 (1st Cir. 2001).  Alleging a poor audit is not equivalent to alleging an intent to deceive.  See Ferris Baker Watts, Inc. v. Ernst & Young, LLP, 395 F.3d 851, 856 (8th Cir. 2005).

[11] In their opening brief, plaintiffs state that prior "management was corrupt, systematically bilking Tyco, and concealing its fraud from public scrutiny." (Emphasis added).  The disclosure statements also note prior management's propensity towards making false booking entries and failing to record material events that should have been recorded.

Similarly, the conclusorily presented "laundry list" of alleged GAAS violations, which lack any specific ties to the alleged fraud at issue, do not get plaintiffs far in creating a strong inference of scienter. See Stone & Webster, 414 F.3d at 214.

Lastly, we come to allegations of PwC's financial motive. "[A]bsent truly extraordinary circumstances, an auditor's motivation to continue a profitable business relationship is not sufficient by itself to support a strong inference of scienter." Id. at 215. Because the balance of plaintiffs' allegations have washed out, the less than extraordinary financial ties between PwC and Tyco do not suffice.[12]

## III.

For the reasons stated above, we **affirm** the judgment of the district court.

---

[12]As to the remaining claims, a Rule 10b-5 violation by the controlled entity is an essential element of a § 20(a) controlling person claim. See In Re Stone & Webster, Inc. Sec. Litig., 424 F.3d 24, 27 (1st Cir. 2005). Our rejection of the § 10(b) claims therefore dooms the plaintiffs' claims against the defendants under § 20(a). See Credit Suisse, 431 F.3d at 53.